IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

J & J SPORTS PRODUCTIONS,      *
INC.                           *
                               *
v.                             *      Civil Action No. WMN-11-3333
                               *
TAG GALLERIES, LLC             *
                               *
                               *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM & ORDER

During the relevant time period, Defendant TAG Galleries, LLC owned and operated an art gallery in Baltimore, Maryland.[1] Plaintiff J & J Sports Productions, Inc. is a California corporation that owned the exclusive distribution rights for a particular prizefight (the Program) which was telecast on November 14/15, 2009.  Plaintiff filed this action alleging that Defendant exhibited the Program without proper authorization. The Complaint asserted three claims: a violation of 47 U.S.C. § 605 (Count I); a violation of 47 U.S.C. § 553 (Count II); and a claim of conversion (Count III).  On July 3, 2012, this Court issued a Memorandum & Order dismissing Count III but allowing Counts I and II to go forward.  ECF No. 15.

Plaintiff has now filed a Motion for Summary Judgment.  ECF No. 30.  The motion is fully briefed and ripe for decision.

---

[1] Defendant is no longer in business, the corporation having been dissolved as of July 22, 2013.

Upon review of the evidence before the Court and the relevant
case law, the Court determines that no hearing is necessary,
Local Rule 105.6, and that the motion will be denied.

The facts, in the light most favorable to Defendant, are as
follows.  Defendant operated an art gallery, The TAG Gallery, in
the Fells Point neighborhood of Baltimore.  On the night of
November 14, 2009, the gallery closed for business shortly after
9:00 p.m.  After the gallery closed, Ian Woods, one of
Defendant's owners, Woods' brother, and five of Woods' friends,
gathered in the gallery space to watch the Program on Woods'
personal television.  Woods had ordered the Program through his
residential Comcast account, and subsequently paid the $54.99
bill for the Program when his bill came due.  He states that he
chose to watch the Program in the gallery because it provided
the best viewing conditions for him and his friends.

Woods considered the gallery space his part-time residence.
He states that, during this period of time when he was trying to
get the gallery up and running, he slept in the gallery at least
two nights per week.  The other nights of the week, he stayed in
a room at a friend's home, rent free.  Woods moved into the
gallery permanently in January 2010.

At 12:40 a.m. on November 15, 2009, more than three hours
after the gallery closed, an investigator hired by Plaintiff
states that she entered the gallery and observed seven or eight

people in the gallery space watching the Program on a "50 inch black flat screen television hung low on the wall at the center of the establishment beside multiple paintings, and art, and above two dark brown, rectangular prism-shaped stands." Aff. of Tarsha Vice at 1. She includes in her affidavit a description of the space -- a description which is entirely consistent with that of an art gallery. She does not explain how she was granted entry into the gallery and she stayed in the gallery less than five minutes. In her form affidavit, she also states that she "paid a cover charge of $ 0 to enter this establishment." Id.

Much of Plaintiff's motion for summary judgment appears to have been cut and pasted from motions submitted in the more typical cases brought by Plaintiff, i.e., where a fight program was shown in a bar or similar establishment without proper permission or authorization. In this motion, Plaintiff seeks summary judgment in its favor on its § 553 claim and requests the award of statutory damages under § 553(c)(3)(A)(ii). Plaintiff also, somewhat inexplicably, seeks "enhanced" damages under § 553(c)(3)(B), contending that Defendant's violation was "committed willfully and for purposes of commercial advantage or private financial gain." ECF No. 30. As support for these enhanced damages, Plaintiff argues that they are justified, in part, because Defendant required patrons to pay a cover charge

to see the Program, see, id. at 15, even though its own investigator clearly stated that no such fee was charged.

Under Federal Rule of Civil Procedure 56, a court shall only grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When the moving party "will have the burden of proof at trial, they must show that no material fact remains by pointing to admissible evidence on each of the elements of their claim."  Major v. CSX Transp., Inc., 170 F. Supp. 2d 563, 566 (D. Md. 2001).  The non-moving party must then point to the record showing an absence of evidence for an essential element of the moving party's claim or present "specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  A motion for summary judgment will be denied when there is a "dispute about a material fact [that] is 'genuine,' that is, if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, all facts and inferences will be drawn in a light most favorable to the non-moving party.  Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).

Here, it is not at all clear that there was even a violation of § 553, much less a violation warranting enhanced

4

damages.  Under the facts presented by Defendant, a finder of
fact could readily find that the viewing of the Program by Woods
and his friends in the gallery space was entirely consistent
with the residential, non-commercial purposes authorized under
Woods' agreement with Comcast.  Woods used the gallery space as
a residence, at least on occasion.  Furthermore, these friends
were watching the Program well after the gallery closed and
there is nothing in the record to suggest that there was any
connection between this viewing and the commercial business or
operation of the art gallery.

The multiple cases cited by Plaintiff are readily
distinguishable.  For example, Plaintiff suggests that the Court
must reject Defendant's argument that watching the Program was
authorized under his Comcast agreement because that very
argument was raised and rejected by the court in <u>Joe Hand
Promotions, Inc. v. Jorkay, LLC</u>, Civ. No. 10-536, 2013 WL
2447867 (E.D.N.C. June 5, 2013).  ECF No. 30 at 7.  In <u>Jorkay</u>,
the defendant paid the residential cost of a fight program to
DirecTV and argued that they did not know that they needed a
different authorization to show the event at their
establishment.  <u>Id.</u> at *2.  While this argument was rejected by
the court, the establishment in question in <u>Jorkay</u> was a bar and
grill, and defendants were showing the event to the bar's
patrons, presumably in the course of the bar's routine business.

Similarly, Plaintiff relies on J & J Sports Productions, Inc. v. Mandell Family Ventures, LLC, 2012 WL 4757694 (N.D. Tex. Oct. 5, 2012). There, the court held that the fact that defendant may have purchased and lawfully received the fight from DirecTV did not immunize it from liability when it broadcast the event in its establishment without paying a sublicense fee to the plaintiff. Id. at *4. In Mandell, however, the defendant was found liable for broadcasting the event to the patrons of its restaurant. Id. at *2.

The Court finds that the additional cases which Plaintiff suggests were decided "under similar factual situations," ECF No. 30 at 6, are equally inapposite. See, e.g., J & J Sports Productions, Inc. v. Morales, Civ. No. 10-01694, 2011 WL 6749080 (E.D. Cal. Dec. 22, 2011) (program shown on three televisions to patrons of Dominic's Bar); Joe Hand Promotions, Inc. v. RPM Management Co. LLC, Civ. No. 9-553, 2011 WL 1043560 (S.D. Ohio Mar. 18, 2011) (program shown to patrons in Ozone Sports Bar); J & J Sports Productions, Inc. v. Q Cafe, Inc., Civ. No. 10-2006, 2012 WL 215282 (N.D. Tex. Jan. 25, 2012) (program shown to 153 patrons on 11 televisions, including 4 large screen televisions in Q Café and Billiards Game Room); J & J Sports Productions, Inc. v. Ortiz, Civ. No. 10-2027, 2011 WL 3111878 (N.D. Ohio July 26, 2011) (program shown to patrons in the El Portilla Cocina, a restaurant and bar). Here, if Defendant's version of the events

is credited, the Program was shown to friends, not patrons, well after the gallery was closed and with no connection, whatsoever, to Defendant's business.  The gallery space was simply a convenient space for a private viewing.

Plaintiff makes two factual arguments challenging Defendant's contention that the gallery space could be considered a "residence."  First, it point to the fact that its investigator "entered the establishment and viewed the Program therein."  ECF No. 33 at 3.  There is no indication, however, as to how the investigator gained entrance to the gallery space or what transpired while she was there.  All that is known is that she was in the space for less than five minutes.  Nothing suggests that she was treated as a patron of the gallery or that the gallery was opened for business.

Second, Plaintiff suggests that the fact that the television was "'hung low on the wall at the center of the establishment beside multiple paintings . . .,'" ECF No. 33 at 3 (quoting Vice Aff. at 2, emphasis added by Plaintiff), somehow contradicts Defendant's statement that "'no patrons or customers of Defendant were invited to see the program in conjunction with its business activities.'"  Id. (quoting Def.'s Opp'n at 3, emphasis added by Plaintiff).  It is difficult to even understand the logic of this argument.  The business of the gallery was selling pieces of art.  That there happen to be

paintings on the wall near where Woods hung his television so he and his friends could watch the fight does not create some connection between the television and the gallery's business endeavors.

Plaintiff also makes a legal argument in response to Defendant's assertion that the gallery space served as his "residence." This argument also has certain logical difficulties. Plaintiff contends that, "even assuming _arguendo_ what Defendant states is true, this is not a defense." ECF No. 33 at 3. Plaintiff observes that, while § 605 of Title 47 of the United States Code (which regulates the interception of satellite cable programming) contains an exception for "'<u>private viewing</u> if the programming involved <u>is not encrypted</u>,'" <u>id.</u> (quoting 476 U.S.C. § 605(b), emphasis added by Plaintiff), § 553 (which regulates the interception of cable programming) contains no enumerated exceptions. Plaintiff then suggests that, because "'the Communications Act explicitly defines "private viewing" as viewing that takes place "in an individual's dwelling unit,"'" <u>id.</u> (quoting <u>G & G Closed Circuit Events, LLC v. Nguyen</u>, 2010 WL 3749284, *4 (N.D. Cal. Sept. 23, 2010)), and, because the gallery is not a "dwelling unit," the exception would not apply, even under § 605. <u>Id.</u> Plaintiff then adds that, even if the gallery was a dwelling unit, the

exception would not apply because the Program was encrypted.
Id.

The difficulty with this argument is that no exception is
needed to escape liability under § 553 unless there is first
some potential violation of the statute.  Section 553 states
that "[n]o person shall intercept or receive or assist in
intercepting or receiving any communication service offered over
a cable system, unless specifically authorized to do so by a
cable operator . . . ."  47 U.S.C. § 553(a)(1).  It is
undisputed that Comcast had the power to authorize and did
authorize Woods to access the Program for "personal,
residential, non-commercial purposes."  Comcast Agreement ¶ 7.
As explained above, the finder of fact could conclude that Woods
did just that.

Accordingly, the Court will deny Plaintiff's motion for
summary judgment.  While Defendant did not move for summary
judgment, even if it had, the Court would probably have denied
that motion as well.  The investigator's entry into the gallery
might open the possibility, albeit remote, that the gallery
remained open and that the showing of the Program was not a
private event.  The Court would add, however, that should this
case go to trial and Plaintiff prevail, damages would likely be
reduced as permitted under § 553(c)(3)(C), which provides, "[i]n
any case where the court finds that the violator was not aware

and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100."

Accordingly, IT IS this 7th day of January, 2014, by the United States District Court for the District of Maryland, ORDERED:

1) That Plaintiff's Motion for Summary Judgment, ECF No. 30, is DENIED;

2) That a telephone conference, to be initiated by counsel for Plaintiff, will be held on January 9, 2014, at 10:30 a.m., for the purpose of setting this case for trial; and

3) That the Clerk of the Court shall transmit a copy of this Memorandum and Order to all counsel of record.


_____/s/_____
William M. Nickerson
Senior United States District Judge